# In the United States Court of Federal Claims
BID PROTEST

|  |  |
|---|---|
| NARCORPS SPECIALTIES, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE UNITED STATES OF AMERICA, ) <br> ) <br> Defendant, ) <br> ) <br> and ) <br> ) <br> VERTICAL JOBS, INC., ) <br> ) <br> Defendant-Intervenor. ) | No. 25-583C <br> (Filed Under Seal: July 18, 2025 \| <br> Reissued: August 11, 2025) * |

Jacob W. Scott, Allison G. Geewax, and Sarah K. Carpenter, Smith Currie Oles LLP, Tysons, VA, for Plaintiff.

Augustus J. Golden, Yaakov M. Roth, Patricia M. McCarthy, and Steven M. Mager, U.S. Department of Justice Washington, DC, for Defendant, William J. Washington II, Michael Kiffney, U.S. Department of Homeland Security, Washington, DC, of Counsel.

Christian B. Nagel, Megan Mocho, Roza S. Sheffield, and Ben R. Smith, Holland & Knight LLP, Tysons, VA, for Defendant-Intervenors.

### OPINION AND ORDER

**KAPLAN, Judge**

In this post-award bid protest, Plaintiff NARCORPS Specialties, LLC ("NARCORPS") challenges the decision of the Transportation Security Administration ("TSA") to award Defendant-Intervenor Vertical Jobs, Inc. ("Vertical") a contract to provide role player support services at the TSA Training Center. NARCORPS contends that TSA's evaluations of Vertical's

---

* This opinion was originally issued under seal and the parties were given the opportunity to request redactions. The parties have not proposed any redactions. Therefore, the Court releases the opinion in full.

technical approach and past performance were arbitrary and capricious. It also contends that TSA failed to adequately document the reasons it found both Vertical's technical approach and its past performance acceptable. NARCORPS further argues that the Solicitation required TSA to conduct a price realism analysis but that TSA failed to do so. See generally Pl.'s Mot. for J. on the Admin. Rec. ("MJAR"), ECF No. 24.

The case is currently before the Court on the parties' cross-motions for judgment on the administrative record. For the reasons set forth below, the Court finds that each of NARCORPS' arguments lacks merit. TSA's decision to award the contract to Vertical was neither arbitrary and capricious, nor contrary to law. NARCORPS' motion for judgment on the administrative record is therefore **DENIED** and the government and Vertical's cross-motions are **GRANTED**.

## BACKGROUND

### I.      The Solicitation

#### A.      Overview

TSA issued Solicitation No. 70T01024Q7670N009 (the "Solicitation" or the Request for Quotes ("RFQ")) on April 5, 2024. Admin. Rec. ("AR") Tab 5 at 52. It requested quotes to provide role player support services in training programs conducted for TSA, the Federal Air Marshal Service, the Federal Flight Deck Officer recurrent training programs, and the TSA Canine Training Center. See AR Tab 6 at 128 (Statement of Work or "SOW").[1] The task order that would result from the Solicitation included a 12-month base period with four successive 12-month option periods, up to a total of five years. AR Tab 3 (Source Selection Plan) at 28.

The RFQ stated that TSA would use the procedures set forth at Federal Acquisition Regulation ("FAR") 8.405-2 to procure role player support services. The contract would be awarded to the quoter that provided the Lowest Price Technically Acceptable ("LPTA") quote. AR Tab 8 at 184. As such, a technical evaluation would be performed only on the lowest price quote and then, if that quote were determined acceptable for Factor 1 (Technical Approach) and Factor 2 (Past Performance), and if the price were found fair and reasonable, the quoter would receive the award. Id. at 184–85. On the other hand, if the quoter with the lowest price quote was assigned an unacceptable rating for their technical approach or past performance, the agency would evaluate the next lowest price quote until a technically acceptable quote was identified. Id. at 184.

Under the Solicitation's Source Selection Plan, the final selection decision would be made by TSA's Acting Deputy Administrator for the Office of Training and Development, in her capacity as the Source Selection Authority ("SSA"). AR Tab 3 at 30. The evaluation of quotes

---

[1] As described in the Source Selection Plan, role players serve "as an integral part of training exercises" designed to teach federal air marshals and federal flight deck officers "law enforcement tasks in various realistic situations" and to instruct canine handlers and "canine assets" in the detection of explosive material on individuals and their personal effects. AR Tab 3 at 28.

2

would be overseen by the Source Selection Evaluation Board ("SSEB"), composed of a Technical Evaluation Team ("TET") and a Price Evaluation Team ("PET"). Id. at 32.

### B.     Technical Evaluation Factors

#### 1.     Factor 1 (Technical Approach)

Under Attachment 3 to the Solicitation (entitled "Instructions to Quoters and Evaluation Ratings") for Factor 1 (Technical Approach), quoters were required to submit a Service Plan, as described in SOW paragraph 1.3.2, and a Transition-In Plan, as described in SOW paragraph 1.3.14. AR Tab 8 at 183. SOW paragraph 1.3.2 defined a Service Plan as "a detailed description of the Contractor's intended plan for accomplishing work which is used to ensure that the Contractor has developed sufficiently responsive and cost effective procedures to deliver adequate service(s)." AR Tab 6 at 129. SOW paragraph 1.3.14 stated that a Transition-In Plan must contain "detailed transition strategies and processes needed to enable an efficient transfer of services from the incumbent service provider to the level of service required under this SOW without disruption to ongoing contract support levels." Id. at 137.

Under Attachment 3, a technical approach would be assigned an acceptable rating where it constituted "an executable approach to the requirement" that "meets the requirements of the solicitation." AR Tab 8 at 184. If the technical approach did not "meet the requirements of the solicitation" it would be assigned an unacceptable rating. Id.

#### 2.     Factor 2 (Past Performance)

Attachment 3 to the RFQ also described the evaluation criteria for Factor 2 (Past Performance). It provided that past performance would be taken into consideration so that the agency could assess the likelihood that the quoter would perform successfully "in providing requirements similar in size, scope, and complexity to this solicitation" considering "both the relevance and quality of past projects." AR Tab 8 at 184. Quoters were to submit Past Performance Questionnaires. Id. at 183; see also AR Tab 9 (blank questionnaire). In addition, Attachment 3 provided that "the Government may use present and/or past performance data obtained from a variety of sources . . . including but not limited to: publicly available reports, and/or data from the Contractor Performance Assessment Rating [] [S]ystem [("CPARS")]." AR Tab 8 at 184.

An acceptable rating would be assigned under Factor 2 where "[t]he Quoter's past performance record indicates a history of developing and delivering satisfactory services/products in the areas described in the solicitation (or areas similar in size, scope and complexity to the solicitation and the SOW)." Id. An unacceptable past performance rating would be assigned in three circumstances: (1) where "the Quoter's past performance verified record provides doubt that the quoter will successfully perform in a manner that meets the Government's requirement," (2) where "[n]o recent/relevant performance record is available," or (3) where "the Quoter's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned." Id.

#### 3.     Factor 3 (Price Evaluation)

Finally, Attachment 3 provided the criteria and procedures that TSA would use to evaluate price. AR Tab 8 at 185–86. It provided that the PET would assign each quote a "Total Evaluated Price" based on the sum of contract line item numbers plus the value of a six-month option period, and described how a total evaluated price would be calculated. Id. Attachment 3 further provided that the PET would evaluate the quoter's prices for the base and option periods to ensure that they were "fair and reasonable for performance of the requirements established in the solicitation and as quoted in the technical submission." Id. at 185.

## II.    The Initial Award and First GAO Protest

TSA received two timely quotes in response to the Solicitation: one from Defendant-Intervenor Vertical, and one from Plaintiff NARCORPS. AR Tab 82 at 1797. On August 22, 2024, TSA awarded the task order to Vertical and issued an unsuccessful notification letter to NARCORPS. See AR Tabs 46–47.

On August 30, 2024, NARCORPS filed a protest of the award with the Government Accountability Office ("GAO"). AR Tab 48. Among other things, NARCORPS argued that Service Contract Act ("SCA") wage determinations included in the Solicitation were outdated. Id. at 1059. NARCORPS pointed out that after proposals were submitted, but before the contract was awarded, the SCA health and welfare fringe benefit rates had increased. Id. at 1052.

After TSA undertook voluntary corrective action and canceled the award to Vertical, GAO dismissed the protest as moot. AR Tab 82 at 1797; see also AR Tab 50 at 1223 (Notice of Corrective Action). TSA issued several amendments to the Solicitation including A0002, which revised the period of performance dates and the role player wages under the SCA. AR Tab 17 at 345.

## III.    The Second Evaluation and Award

Both NARCORPS and Vertical again submitted timely quotes after TSA issued the amendments to the Solicitation. See AR Tabs 52–66. Vertical's revised quote had a total evaluated price of $39,707,448.00. AR Tab 65 at 1409. NARCORPS' revised quote had a total evaluated price of $41,642,226.00. AR Tab 54 at 1245. Because Vertical's total evaluated price was lower than NARCORPS', the TET conducted a technical evaluation of Vertical's quote, but not NARCORPS'. See AR Tab 26 at 528.

### A.    The TET's Evaluation of Vertical's Technical Approach (Factor 1)

The TET once again assigned Vertical's technical approach an acceptable rating. AR Tab 67 at 1412–14. It based that rating on its review of Vertical's Service Plan and Transition-In Plan, each of which it concluded provided "executable approach[es]" to the Solicitation's requirements. Id.

### B.    The TET's Evaluation of Vertical's Past Performance (Factor 2)

The TET also assigned Vertical an acceptable rating for Factor 2 (past performance). AR Tab 67 at 1416. It evaluated the past performance references Vertical submitted on its questionnaire. Id. at 1415. It also conducted a CPARS check of prior work that Vertical provided

4

to the Federal Bureau of Investigation ("FBI") Training Academy and the U.S. Department of State ("DOS") Foreign Service Institute ("FSI"). Id. The TET determined that the past performance references "included previous contracts that are similar in size, scope, and complexity to the solicitation and the SOW." Id.

### C. The PET's Evaluation of Vertical's Price (Factor 3)

The PET conducted an evaluation of the price of Vertical's quote. AR Tab 68; see also AR Tab 63 (Vertical Jobs' Quote Volume 3 - Pricing). It found that Vertical had provided the price information required by the Solicitation. AR Tab 68 at 1417. It also concluded that "the level of effort and the labor mix quoted is in alignment with the Government stipulated hours and labor mix" and the GSA contract. Id. at 1419. In addition, the PET found that Vertical's price quote was "based on competition and is lower than the Independent Government Cost Estimate." Id. The PET therefore concluded that Vertical's price was fair and reasonable. Id. at 1421.

### D. The Decision of the Source Selection Authority

The SSA considered the reports of the TET and the PET and conducted an independent review of all evaluation documents. See AR Tab 69. She concluded that Vertical's quote "represents the Lowest Price Technically Acceptable offer and is best-suited in fulfilling the Government's requirements." Id. at 1425. The TSA accordingly awarded the contract to Vertical on December 20, 2024. See AR Tab 71 at 1463.

## IV. The Second GAO Protest

On December 27, 2024, NARCORPS filed a second GAO protest. AR Tab 75. In that protest, NARCORPS argued that TSA awarded the contract to Vertical "on the basis of an unrealistically priced proposal" that indicated a lack of understanding of the contract requirements. Id. at AR 1603–04. In addition, NARCORPS contended that TSA failed to properly consider Vertical's "lack of relevant experience and past performance" in assigning it acceptable ratings for Factors 1 and 2. Id. at 1604. NARCORPS also argued that TSA was required by the Solicitation to conduct a price realism analysis and that TSA did not comply with that requirement. Id. at 1613. Finally, in a supplemental protest filed on February 3, 2025, NARCORPS further claimed that TSA: (1) failed to properly document its evaluations of Factors 1 and 2; and (2) "improperly conflated its evaluation of Vertical Jobs' experience under the technical approach factor and Vertical Jobs' past performance." AR Tab 94 at 2688.

The GAO found NARCORPS' arguments unpersuasive. On March 28, 2025, it issued a decision dismissing in part and denying in part the protest. AR Tab 98.

## V. This Action

NARCORPS filed the present protest with this court on April 2, 2025. Compl., ECF No. 1. NARCORPS alleges that TSA should have found Vertical's technical approach (Factor 1) unacceptable because, according to NARCORPS, the SOW included an "experience requirement" and "Vertical Jobs' quote did not include a demonstration of the requisite experience," nor could Vertical rely on the past performance information supplied under Factor 2 to "satisfy the requirement that the experience be on similar contracts of similar size, scope, and

5

complexity." Id. at 20–21 (emphasis added). NARCORPS also contends that TSA should have found Vertical's past performance (Factor 2) unacceptable because Vertical's quote did not demonstrate past performance in projects similar in size, scope and complexity to the Solicitation and the SOW. Id. at 21. also In addition, NARCORPS contends that the Solicitation required TSA to perform a price realism analysis of Vertical's proposal but TSA did not do so. Id. at 23. And finally, NARCORPS claims that TSA failed to adequately document the reasons for its determinations regarding Factors 1 and 2. Id. at 24.

On May 14, 2025, NARCORPS filed a motion for judgment on the administrative record. Pl.'s MJAR, ECF No. 24. The government and Defendant-Intervenor Vertical have since filed cross-motions for judgment on the administrative record. ECF Nos. 26 and 27. Briefing on the cross-motions was completed on June 10, 2025, see ECF No. 32, and the Court heard oral argument on July 9, 2025, see Order, ECF No. 34.

## DISCUSSION

### I. Jurisdiction

The Court of Federal Claims has subject-matter jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 § 12, 28 U.S.C. § 1491(b). Specifically, the court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b). A plaintiff has standing to bring a protest where they are an "interested party"—i.e., "an actual or prospective bidder . . . whose direct economic interest would be affected by the award of the contract." CGI Fed., Inc. v. United States, 779 F.3d 1346, 1348 (Fed. Cir. 2015) (quoting Am. Fed'n of Gov't Emps., AFL-CIO v. United States, 258 F.3d 1294, 1299 (Fed. Cir. 2001)). In a post-award bid protest like the present one, a protestor is an interested party if it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (citing Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009); Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006).

Under this precedent, NARCORPS is an interested party within the meaning of 28 U.S.C. § 1491(b)(1). As the only quoter other than the awardee, NARCORPS would have had a substantial chance of winning the award if Vertical's quote was found not technically acceptable, or if TSA concluded that Vertical's price was unrealistic. Therefore, NARCORPS has standing to pursue this protest.

### II. Motions for Judgment on the Administrative Record

The court reviews bid protests on the basis of the administrative record. Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed Cir. 2009); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). Parties may move for judgment on the

6

administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Bannum, 404 F.3d at 1357.

The court's inquiry in ruling on a motion for judgment on the administrative record is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record." XOtech, LLC v. United States, 950 F.3d 1376, 1379–80 (Fed. Cir. 2020) (quoting Palantir USG, Inc. v. United States, 904 F.3d 980, 989 (Fed. Cir. 2018)). Unlike a summary judgment proceeding, genuine issues of material fact do not foreclose the entry of judgment on the administrative record. Bannum, 404 F.3d at 1356.

### III. Scope of Review

The court reviews agency procurement decisions under the standards used to evaluate agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). As such, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013); see 5 U.S.C. § 706(2)(A).

This "highly deferential" standard of review requires a reviewing court to "sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). The Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). Its review is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa, 238 F.3d at 1332–33 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (noting that a court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action").

Under this narrow standard of review, a disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. See Impresa, 238 F.3d at 1338. For the agency to prevail, it need only articulate a "rational connection between the facts found and the choice made," and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (first quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962); then quoting Bowman Transp., 419 U.S. at 286). Thus, the agency's action will only be set aside where the court is persuaded that the agency either "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id.

Case 1:25-cv-00583-EDK   Document 39   Filed 08/11/25   Page 8 of 16

8

**IV.    Merits**

    **A.    NARCORPS' Argument that TSA's Evaluation of Vertical's Technical Approach (Factor 1) Was Arbitrary and Capricious Because It Failed to Consider Vertical's Alleged Lack of Experience**

NARCORPS contends that TSA's decision to rate Vertical acceptable for Factor 1 (Technical Approach) was arbitrary and capricious. It argues that the Solicitation required TSA to take Vertical's alleged lack of experience into consideration when it conducted its Factor 1 evaluation. Had it done so, NARCORPS argues, it would have necessarily found Vertical's technical approach unacceptable.

This argument lacks merit. Under the evaluation criteria set forth in Attachment 3, a quoter's experience is not taken into consideration when evaluating their technical approach. See AR Tab 26. Rather, the agency was to determine whether the Service Plan and Transition-In Plan provided "an executable approach to the Solicitation's requirements." Id. at 184. If so, then the quoter would receive an acceptable rating on their technical approach.

The TET followed the prescribed process here. First, it found Vertical's Service Plan supplied an "executable approach" to the Solicitation's requirements. AR Tab 67 at 1412–13. It explained that the Service Plan "included detailed information on how [Vertical] intends to support TSA's Role Player Support Services requirement" in all of the areas set forth in the SOW. Id. Specifically, the TET found that Vertical's plan: 1) "clearly detailed" the roles and responsibilities of the project manager and supervisory staff, "with a defined chain of command"; 2) gave the project manager and supervisory staff direct access to two "seasoned subject-matter experts"; and 3) provided for the maintenance of a "contract-dedicated advisory board comprised of former TSA executives that have extensive, hands-on experience executing the TSA mission for over (on average) twenty years." Id. at 1413. In addition, the TET noted that Vertical was providing, "at no additional cost, a corporate Administrative Assistant experienced in contract administration and processes." Id. Finally, the TET noted that Vertical's "employee recruitment, screening, assessment, and selection strategy" included "a multi-layered approach, which allows for incumbent capture," and that its team also included six human resources professionals to support staffing, onboarding, and retaining personnel, as well as timely adjudication of personnel suitability checks. Id.

The TET similarly concluded that Vertical's Transition-In Plan, AR Tab 59 at 1354–58, met the requirements of the SOW and provided an "executable approach" to the Solicitation's requirements, AR Tab 67 at 1414. It observed that the plan "included detailed information on how it intends to support TSA's Role Player Support Services requirement" in all of the relevant areas covered by the SOW. Id. This included, among other things, detailed information about how Vertical intended to coordinate with the incumbent service provider and transition the contract over within 60 days, meeting the SOW requirement that the transition period not exceed 90 calendar days. Id.

NARCORPS does not challenge the TET's conclusions that Vertical's Service and Transition-In Plans provided executable approaches to the Solicitation's requirements. Instead, it contends that the TET erred in failing to also consider Vertical's alleged lack of experience when

evaluating its technical approach. But that argument is not based on the evaluation criteria contained in the Solicitation. It is instead based on language in the Introduction to the SOW at section 1.1B, which states that "[t]he contractor must be experienced in providing role player support services for multiple training programs involving security, law enforcement, and canine training at similar size, scope, and complexity as outlined throughout the SOW," and that the "[e]xperience may be demonstrated through comparable role player support services contract projects that are currently in process or were completed within [the] last three (3) years." AR Tab 18 at 421. According to NARCORPS, this provision imposed an experience requirement that Vertical should have been required to meet to receive an acceptable rating on its technical approach.

NARCORPS' argument is unpersuasive. For one thing, the requirements of the SOW are enumerated in SOW 1.3 ("General Requirements") and SOW 1.4 ("Special Requirements"), not its Introduction. See id. at 422–31. Second, if TSA intended to incorporate an experience requirement into its evaluation of quoters' technical approaches, it would have had to require quoters to submit information about their experience in their Factor 1 proposal. Instead, quoters were required to supply proposed Service and Transition-In Plans. And TSA's criteria for evaluating those plans did not require consideration of quoters' past experience. It required consideration of whether the plans themselves provided an executable approach to the solicitation. Finally, even assuming that a quoter's "experience" had to meet a particular threshold to secure an acceptable technical rating, the quality of a quoter's experience is taken into consideration in the evaluation of a quote under Factor 2 (Past Performance), not Factor 1 (Technical Approach).

NARCORPS' contention—that considering a quoter's experience in the context of evaluating their past performance "improperly conflate[s]" experience and past performance—lacks merit. Pl.'s MJAR at 18. The past performance factor is employed as a measure of whether the quoter's experience is of sufficient relevance and quality to imbue confidence that they will be able to perform the requirements of the contract.

NARCORPS relies on this Court's decision in XPO Logistics Worldwide Gov't Servs., LLC v. United States, 134 Fed. Cl. 783 (2017), aff'd, 713 F. App'x 1008 (Fed. Cir. 2018), to make its conflation point, noting the Court's observation that "[w]here an agency includes separate experience and past performance factors, the former focuses on the degree to which an offeror has actually performed similar work, whereas the latter focuses on the quality of the work." Pl.'s MJAR at 18–19 (quoting XPO Logistics, 134 Fed. Cl. at 804).

But XPO Logistics is inapposite. The agency's source selection plan in that case required offerors to submit separate volumes, one for Corporate Experience and one for Past Performance, and there were separate evaluation criteria for each. 134 Fed. Cl. at 804 n.14. Here, by contrast, the Solicitation includes only a past performance factor. It did not require separate evaluations of experience and past performance. To the contrary, the past performance factor required the agency to consider the relevance of a quoter's experience, i.e., "the degree to which an offeror has actually performed similar work." See id. at 804; see also AR Tab 26 at 528 ("The [past performance] evaluation will consider both the relevance and quality of past projects."). And the TET took that into consideration when conducting its evaluation of past performance. See AR 67 at 1415–16. For these reasons, the Court rejects NARCORPS' argument that TSA

10

violated the terms of the Solicitation by not considering Vertical's experience when evaluating its technical approach.

### B. NARCORPS' Argument that TSA's Assignment of an Acceptable Rating to Vertical's Past Performance Was Arbitrary and Capricious

As described above, under the Solicitation, a quoter would receive an acceptable rating for Factor 2 where their "past performance record indicates that they have a history of developing and delivering satisfactory services/products in the areas described in the solicitation (or areas similar in size, scope and complexity to the solicitation and the SOW)."AR Tab 26 at 528. Consistent with the criteria set forth in Attachment 3 to the Solicitation, the TET explained, it reviewed the references Vertical described in its questionnaire and conducted a CPARS check of prior work that Vertical Jobs provided to the FBI Training Academy, DOS, and FSI. AR Tab 67 at 1415.

Based on this information, the TET determined that Vertical's past performance references "included previous contracts that are similar in size, scope, and complexity to the solicitation and the SOW." Id. The TET explained that these included contracts involving "multiple Role Player task orders, with several different Government agencies, running concurrently, each with valuations in the several millions and combined values at tens of millions." Id. In addition, the TET Chairperson checked Vertical's references at the Secret Service and DOS, receiving two positive reports. Id.[2]

NARCORPS disagrees with the TET's determination that Vertical's past performance examples were comparable in size, scope, and complexity to the work it would be required to perform under the SOW. NARCORPS observes that the contract TSA awarded to Vertical involves approximately $38 million of work over a five-year period but that the ceiling values of Vertical's past performance examples were significantly lower. In addition, NARCORPS contends that none of Vertical's past performance references involve management and manpower requirements that were similar in size, scope, or complexity to those set forth in the Solicitation and the SOW. Pl.'s MJAR at 15–17.

---

[2] As noted above, under the Solicitation there were two routes by which a quoter's past performance might be deemed acceptable. First, past performance could be found acceptable where the performance record reflected "areas described in the solicitation," i.e., role-playing services. AR Tab 26 at 528. Theoretically, that criterion was satisfied here because the TET found that Vertical's references included "multiple Role Player task orders, with several different Government agencies, running concurrently, each with valuations in the several millions and combined values at tens of millions." AR Tab 67 at 1415. The TET, however, chose not to rely on Vertical's "history of developing and delivering satisfactory services/products in the areas described in the solicitation." Id. at 1411. Instead, it found Vertical's past performance acceptable because, it concluded, "[Vertical's] past performance references included previous contracts that are similar in size, scope, and complexity to the solicitation and the SOW." Id. at 1415. Because TSA relied on this criterion to find that Vertical's past performance was acceptable, that is the focus of the Court's review.

It is well established that "[e]valuation of experience and past performance, by its very nature, is subjective . . . and an offeror's mere disagreement with an agency's evaluation judgments does not demonstrate that those judgments are unreasonable." Alisud - Gesac Handling - Servisair 2 Scarl v. United States, 161 Fed Cl. 655, 668 (2022). Indeed, TSA's conclusion that Vertical's past performance references were sufficiently similar in size, scope, and complexity to merit an acceptable rating is entitled to "the greatest deference possible." Id.; see also Glenn Def. Marine, 720 F.3d at 910 (affording an agency "broad discretion" in past performance evaluation); Dynamic Sys. Tech., Inc. v. United States, 127 Fed. Cl. 551, 562 (2016) ("[C]ourts give 'the greatest deference possible . . . to the agency' when reviewing an agency's evaluation of an offeror's past performance." (second alteration in original) (quoting Sci. & Mgmt. Res., Inc. v. United States, 117 Fed. Cl. 54, 65 (2014))); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 539 (2010) ("[W]hat does or does not constitute 'relevant' past performance falls within the [contracting agency's] considered discretion." (citing FAR 15.305(a)(2)(ii)).

NARCORPS has not provided the Court with a basis to set aside the TET's judgment regarding Vertical's past performance examples. In fact, its comparisons between the ceiling prices of Vertical's past contracts and the price of the contract awarded here are somewhat misleading. The Solicitation here is for a five-year contract valued between $36,097,680.00 (Vertical's quote) and $37,841,280.00 (NARCORPS' quote). The contract price for the services covered by the Solicitation is therefore approximately $7.4 million per year. Vertical's quote relied on three role player task orders issued by different government agencies and running concurrently. Those were (1) a five-year contract valued at $5 million ($1 million per year); (2) a one-year contract valued at approximately $2.15 million ($2.15 million per year); and (3) a five-year contract valued at $7 million ($1.4 million per year). See AR Tab 61 at 1375, 77–78. Vertical's references, in other words, total to a yearly contract value of approximately $4.55 million, as compared to the Solicitation's yearly value of $7.4 million.

The Court is also unpersuaded by NARCORPS' comparison of the staffing requirements in the Solicitation to those in Vertical's past performance examples. NARCORPS notes that the Solicitation calls for one project manager to cover four different sites and oversee six site supervisors. It observes that, by contrast, in the year in which Vertical's past performance projects ran concurrently, there was a dedicated project manager for each of them. It also argues that Vertical "does not have experience mobilizing the large number of role players required by the Solicitation," i.e., 270 players per day. Pl.'s MJAR at 16. To the contrary, NARCORPS contends, "[Vertical's] largest contract called for, at most, 100 role players at once—not 150 in one location, and certainly not 270 at once in the aggregate." Id.

To be sure, the number of role players the Solicitation required at any particular time was greater than the number supplied in Vertical's past performance examples, even when taken collectively. The number of project managers was also fewer. But to justify an acceptable past performance rating, it was not necessary that TSA find staffing requirements to be the same or even almost the same. Rather, the Solicitation required that the size, scope, and complexity of the undertakings be "similar." TSA's finding that this rather low bar was met is, as noted, entitled to considerable deference, and the Court has no basis for finding it unreasonable.

12

Finally, the Court rejects NARCORPS' contention that TSA did not provide sufficient explanation or documentation to support its decision to assign an acceptable rating to Vertical for past performance. The narrative in the TET report explained that the TET had found Vertical's past performance acceptable because Vertical's quote had referenced "multiple Role Player task orders, with several different Government agencies," and those orders ran concurrently. AR Tab 67 at 1415. In addition, each task order had "valuations in the several millions and combined values at tens of millions." Id. The narrative also reveals that the TET's decision was based on conversations between the TET Chairperson and Vertical's references at the Secret Service and the State Department, who supplied positive reports regarding Vertical's performance. Id.[3] Because the TET report articulated a "rational connection between the facts found and the choice made," and because its "path may reasonably be discerned" this Court has no basis for setting that rating aside. See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (first quoting Burlington Truck Lines, 371 U.S. at 168; then quoting Bowman Transp., 419 U.S. at 286).

### C.    NARCORPS' Challenge to TSA's Price Evaluation

Finally, NARCORPS challenges the agency's evaluation of Vertical's price on several grounds, all of which are related to its contention that the Solicitation required TSA to perform a price realism analysis of Vertical's quote. These arguments lack merit.

#### 1.    NARCORPS' Argument that the Solicitation Required the Agency to Conduct a Price Realism Analysis

"A price realism analysis addresses whether the offeror 'is proposing a price so low that performance of the contract will be threatened.'" Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 541 (2013) (quoting DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 657 n.5 (2010)); see also Ceres Env't Servs., Inc. v. United States, 97 Fed. Cl. 277, 303 (2011). ("Arguments that an agency did not perform an appropriate analysis to determine whether prices are too low, such that there may be a risk of poor performance, concern price realism." (quoting Cl. Price & Assocs., Inc., B-403476.2, 2011 CPD ¶ 16, at *3 (Jan. 7, 2011))). There is no requirement that a price realism analysis be conducted in a FAR 8.4 procurement.

Of course, even where a price realism analysis is not required under the FAR, "[a] procuring 'agency may, at its discretion, provide for the use of a price realism analysis to measure an offeror's understanding of the solicitation requirements, or to avoid the risk of poor

---

[3] NARCORPS also contends that the TET erred when, in evaluating Vertical's past performance it relied upon the results of two CPARS ratings that it believed corresponded to Vertical's contract with the FBI Academy but likely did not. Pl.'s MJAR at 14 (citing AR Tab 67 at 1415–16). The Court will assume that NARCORPS is correct that the CPARS checks mentioned in the TET report did not concern Vertical's contract with the FBI Academy. However, CPARS checks were optional, not mandatory. Further, any error on the TET's part in considering the two CPARS ratings was harmless because there is sufficient independent justification in the record for Vertical's acceptable rating based on the information contained in its detailed past performance submittal, and reference calls made to the Secret Service and DOS. See generally AR Tab 61.

13

performance from a contractor who is forced to provide goods or services at little or no profit.'" Mgmt. & Training Corp. v. United States, 161 Fed. Cl. 578, 607 (2022) (quoting Ceres Env't, 97 Fed. Cl. at 303). However, as with other requirements, offerors must be given notice of the agency's intent to perform a price realism analysis. Indeed, "if a solicitation 'does not expressly or implicitly require a price realism analysis,' a procuring agency is prohibited from conducting one." Id. (quoting Ceres Env't, 97 Fed Cl. at 306).

NARCORPS does not contend that the Solicitation explicitly required TSA to conduct a price realism analysis of Vertical's quote. Instead, it asserts that such a requirement can be implied based on one sentence on the last page of Attachment 3 to the Solicitation. It states that "[t]he Government may reject any quote that is evaluated to be non-compliant with the solicitation requirements or reflects a failure to comprehend the complexity and risks of the work performed." AR Tab 26 at 530. It contends that this sentence is similar to language that courts have found gave rise to an implicit obligation to conduct a price realism analysis. See Pl.'s MJAR at 23–24 (citing Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 357 (2009)).

But contrary to NARCORPS' argument, this language is materially different from language that has been found to implicitly obligate agencies to conduct price realism analyses. In the cases NARCORPS cites, although the solicitations did not use the phrase "price realism analysis," they expressly stated that the agency would consider whether an offeror's price was so low as to reflect a lack of understanding of the solicitation's requirements.

For example, in Afghan American Army Services Corp., the solicitation stated that the agency would "evaluate price proposals to determine whether the offered price reflects a sufficient understanding of the contract requirements and the risk inherent in the offeror's approach" and that proposals with "an unreasonable (high or low) price may be deemed to be unacceptable and may not receive further consideration." 90 Fed. Cl. at 349. Although the phrase "price realism analysis" did not appear, the analysis described was, by definition, a price realism analysis. Similarly, in ViON Corp. v. United States, the court held that a solicitation required a price realism analysis where it stated that the agency "may reject any proposal that is evaluated to be . . . unreasonably high or low in price . . . such that the proposal is deemed to reflect an inherent lack of competence or failure to comprehend the complexity and risks of the program." 122 Fed. Cl. 559, 564 (2015) (first alteration in original); see also Med. Matrix, LLP v. United States, No. 07-545C, 2007 WL 5161789, at *9 (Fed. Cl. Dec. 12, 2007) (holding that the solicitation's language stipulating that "proposals that are unrealistically high or low in cost will be deemed reflective of an inherent lack of technical competence or indicative of a failure to comprehend the proposed requirements and will be rejected" "reflect[ed] a desire, on the part of the agency, to conduct a price realism analysis" (cleaned up)).

As is readily apparent, the caselaw suggests that to find a price realism analysis required by implication, the provision that gives rise to the implication must expressly reference price. Indeed, in Advanced C4 Solutions, Inc., GAO observed that "in the absence of an express price realism provision, [GAO] will only conclude that a solicitation contemplates a price realism evaluation where the RFP expressly states that the agency will review prices to determine whether they are so low that they reflect a lack of technical understanding, and where the RFP states that a proposal can be rejected for offering low prices." B-416250.2 et al., 2018 CPD ¶ 344

14

(Comp. Gen. Oct. 2, 2018). There is no language in the present Solicitation that would meet these criteria. [4]

NARCORPS attempts to bring the Solicitation within this precedent by asserting that while the sentence on the last page of Attachment 3 did not make any reference to price, it appears "under the subheading 'Price Evaluation'" and was "directly below the summary of the calculation methodology for Total Evaluated Price." Pl.'s MJAR at 22–23 (quoting AR Tab 26 at AR 530). But this assertion is inaccurate.

Attachment 3 contains instructions to quoters covering TSA's evaluation of their quotes under all three factors: Technical Approach (Factor 1), Past Performance (Factor 2), and Price (Factor 3). The statement that "[t]he Government may reject any quote that is evaluated to be non-compliant with the solicitation requirements or reflects a failure to comprehend the complexity and risks of the work performed" is not part of the "Price Evaluation" section as NARCORPS contends. AR Tab 26 at 530. To the contrary, like the text that follows the sentence, it appears in Attachment 3 after the Price Evaluation section ends. See id. at 529–30.

NARCORPS further argues that the Solicitation's requirement that "[p]rices . . . will be evaluated to ensure that they are fair and reasonable for performance of the requirements established in the solicitation" supports its contention that the Solicitation required the agency to perform a price realism analysis. Pl.'s MJAR at 23 (first alteration in original) (quoting AR Tab 26 at 529). But the "realism" of a price is not the same as its fairness or reasonableness. "[A] price reasonableness analysis has the goal of preventing the government from paying too much for contract work." DMS All-Star Joint Venture, 90 Fed. Cl. at 657 n.5. "A price realism analysis, on the other hand, investigates whether the contractor is proposing a price so low that performance of the contract will be threatened." Id.

Finally, the Court notes that "it is improper for an agency to conduct a price realism analysis in a fixed-price procurement when the solicitation does not expressly or implicitly require a price realism analysis because such an analysis would employ unstated evaluation criteria." See UnitedHealth Mil. & Veterans Servs., LLC v. United States, 132 Fed. Cl. 529, 561 (2017) (citing NVE, Inc. v. United States, 121 Fed. Cl. 169, 180 (2015)). Therefore, if the TSA had conducted a price realism analysis and then rejected Vertical's quote for having an unrealistically low price, its determination would have been set aside. See Ceres Env't, 97 Fed. Cl. at 306.

### 2. NARCORPS' Other Challenges to TSA's Price Evaluation

In addition to its argument that TSA was obligated to conduct a price realism analysis, NARCORPS argues that TSA's price evaluation was arbitrary and capricious because it relied on an Independent Government Cost Estimate ("IGCE") that was flawed. Specifically, according to NARCORPS, the IGCE prices were not updated when the Solicitation was amended following

---

[4] "Though GAO opinions are not binding on this court, . . . this court may draw on GAO's opinions for its application of [its] expertise." Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011) (citation omitted).

the first GSA protest. Pl.'s MJAR at 24–26. Had they been updated, another labor category would have been added, and the minimum wage rates increased. Not updating the information, NARCORPS argues, caused the IGCE to reflect artificially low prices. See id. NARCORPS argues that because TSA relied on the IGCE as a comparator when it conducted its price evaluation, it could not "meaningfully conduct the price realism analysis it committed itself to in the solicitation." Id. at 26 (quoting Afghan Am. Army Servs. Corp., 90 Fed. Cl. at 359).

Although not entirely clear, the Court understands this argument to be premised on TSA having an obligation to perform a price realism analysis, which it contends would have been distorted by the IGCE's artificially low prices. Because the Court has rejected the premise that TSA was obligated to perform a price realism analysis, NARCORPS' arguments regarding the impact of a flawed IGCE are immaterial.

Finally, the Court is not sure what to make of NARCORPS' argument that if TSA had conducted a price realism analysis it would have found Vertical ineligible for award. NARCORPS contends that "[a] basic comparison of the requirements and the pricing scheme would have alerted TSA to the fact that Vertical Jobs does not understand the technical requirements of the Contract and cannot realistically perform at the proposed price." Id.

It is not self-evident to the Court that Vertical's price would necessarily have been found unrealistic if a price realism analysis had been performed. In fact, there is only a relatively small difference between Vertical's total evaluated price and NARCORPS'. But more to the point, while this argument might be relevant to whether NARCORPS was prejudiced by TSA's failure to conduct a price realism analysis, the Court has found such an analysis not required. It therefore will not weigh in on what the results of such an analysis would have been or how they would have affected the award decision.

## CONCLUSION

For the reasons discussed above, NARCORPS' motion for judgment on the administrative record is **DENIED** and the government and Vertical's cross-motions for judgment on the administrative record are **GRANTED**. The clerk is directed to enter judgment accordingly. Each party shall bear its own costs.

This Opinion and Order has been issued under seal. The parties shall have two weeks to propose redactions and, accordingly, file such proposed redactions by August 4, 2025. To aid the Court's evaluation of the proposed redactions, each party shall file a memorandum explaining why redactions are necessary for each item of information for which a redaction is proposed.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan<br>
ELAINE D. KAPLAN<br>
Judge